The document below is hereby signed.

Signed: September 24, 2014



_S. Martin Teel Jr._

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                              )
                                   )
STEPHEN THOMAS YELVERTON,          )    Case No. 09-00414
                                   )    (Chapter 7)
              Debtor.              )
_____    )
                                   )
UNITED STATES EX REL.              )
STEPHEN THOMAS YELVERTON,          )
                                   )
              Plaintiff,           )
                                   )    Adversary Proceeding No.
         v.                        )    14-10014
                                   )
WENDELL W. WEBSTER, _et al._,      )    Not for publication in
                                   )    West's Bankruptcy Reporter.
              Defendants.          )

<u>MEMORANDUM DECISION RE MOTION TO DISMISS</u>

The plaintiff, Stephen Thomas Yelverton, is the debtor in

the bankruptcy case, pending under chapter 7 of the Bankruptcy

Code (11 U.S.C.), within which he pursues this adversary

proceeding against the chapter 7 trustee, Wendell W. Webster, and

Webster's surety, Federal Insurance Company.  Yelverton is vexed

because Webster entered into a global settlement agreement with

Yelverton's sisters in the main bankruptcy case under terms which Yelverton finds wanting.  In return for the sum of $110,000 paid to the estate, the settlement extinguished litigation claims brought by Yelverton against his sisters and eliminated Yelverton's ownership interest in the family's pig farm. Yelverton filed an objection to Webster's motion for court approval of the settlement and, after the court approved the settlement over his objection, sought to overturn that approval through various motions and appeals.  Unsuccessful in those attacks, he initiated this adversary proceeding to collaterally attack the settlement by alleging in his corrected amended complaint that Webster breached his fiduciary duties by negotiating and agreeing to the settlement terms.  However, the corrected amended complaint must be dismissed because (1) it fails to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure for it fails to include well-pled facts supporting the claims asserted, and it is not plausible on its face; and (2) Yelverton is barred from re-litigating his objections to the settlement by the doctrines of *res judicata* (claim preclusion) and collateral estoppel (issue preclusion).

I

The following facts are a matter of record in the bankruptcy court or are gleaned from the corrected amended complaint (whose

2

well-pled facts must be treated as true in addressing a motion under Federal Rule of Civil Procedure 12(b)(6)).

Yelverton commenced his bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on May 14, 2009. During the time the case was pending as a chapter 11 case, Yelverton was a debtor in possession under 11 U.S.C. § 1101(1). As such, 11 U.S.C. § 1107(a) authorized him to exercise certain powers of a trustee, including the power under 11 U.S.C. § 323(b) to sue on behalf of the estate.

On July 29, 2009, Yelverton exercised that power by commencing a civil action against his sisters, Deborah Marm and Phyllis Edmundson, in Case No. 5:09-cv-331, before the U.S. District Court for the Eastern District of North Carolina, wherein he "asserted monetary claims against them for damages of up to $3 Million for misappropriating for their own personal use his lawfully owned stock and equity in Yelverton Farms, Ltd., which is a North Carolina closely-held corporation" and included "a demand to place Yelverton Farms, Ltd., into Receivership under N.C.G.S., Sections 55-14-30 (ii), 55-14-31, and 55-14-32, in order to Dissolve and Liquidate the corporation." Corr. Am. Compl. ¶¶ 37, 44. Marm and Edmunson were represented by attorney Jeffery L. Tarkenton, who is also their counsel in Yelverton's

bankruptcy case.[1]

On August 20, 2010, pursuant to a motion filed by the United States Trustee, the bankruptcy court converted Yelverton's bankruptcy case to one under chapter 7 of the Bankruptcy Code. Webster became the trustee of the bankruptcy estate, and Yelverton ceased to serve as a debtor in possession.[2] Webster is a "close personal friend" of Tarkenton. *Id.* at ¶ 80. In a motion filed on July 14, 2013 (Dkt. No. 666, at 9),[3] Yelverton acknowledged that he has long been aware of this friendship, reciting that in September 2010 (the month that Webster became the trustee) Webster told Yelverton that Webster is a "close personal friend" of Tarkenton but that this close personal friendship would have no bearing on Webster's fiduciary duty to

---

[1] Tarkenton also served as counsel for Chase Home Finance LLC in a separate adversary proceeding associated with the main bankruptcy case, *Yelverton v. Homes at Potomac Greens Associates, L.P., et al.*, Adversary Proceeding No. 10-10001.

[2] Webster is a member of the panel of chapter 7 trustees in this district under 28 U.S.C. § 586(a)(1). After another member of the panel of Chapter 7 trustees had been appointed interim trustee, but withdrew from serving as the interim trustee, the United States Trustee appointed Webster the interim chapter 7 trustee on September 9, 2010. When no one called for an election of a trustee at the meeting of creditors, Webster became a trustee no longer serving as such on an interim basis. *See* 11 U.S.C. §§ 701(a)(1) and 702(b) and (d). Webster, as trustee, became the representative of the estate under 11 U.S.C. § 323(a), displacing Yelverton as the representative of the estate in the civil action in the Eastern District of North Carolina.

[3] The references in this decision to Docket Numbers is to the docket entries in the bankruptcy case, Case No. 09-00414.

protect the estate and its creditors and to zealously pursue their interests. Webster did not disclose to the bankruptcy court or creditors that he is a "close personal friend" of Tarkenton. Corr. Am. Compl. ¶ 83.

In December 2010, Webster (on behalf of the estate) and Tarkenton (on behalf of Marm and Edmundson and their spouses) started negotiating the settlement. *Id.* at ¶ 98. The negotiations continued to March 2012, with the agreement being signed on March 25, 2012. *Id.*

On May 4, 2012, Webster filed a motion for approval of the settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. On June 18, 2012, the bankruptcy court held a full-day[4] evidentiary hearing on Webster's motion, and Webster testified under direct and cross examination. Yelverton alone cross examined Webster for more than two hours and gave lengthy opening and closing statements. He closely questioned Webster regarding Webster's assessment of the parties' claims and defenses, his actions in investigating and negotiating the settlement, and the aggressiveness of his settlement posture. *See generally* June 18, 2012, Hearing Transcript (Dkt. No. 546 in Case No. 09-00414) (hereinafter "Hearing Tr.") at 53-179. He specifically questioned Webster about his fiduciary duties.

---

[4] The proceedings commenced at 9:41 a.m. and concluded at 5:53 p.m. with 100 minutes for lunch and other breaks.

Hearing Tr. at 77, 86, 89.  The bankruptcy court rendered
findings of fact and conclusions of law from the bench in a 42-
minute-long decision, ruling that the settlement should be
approved.  The court summarized the standard for approving a
settlement:

> A bankruptcy court's decision to approve a settlement
> must be an informed one based upon an objective
> evaluation of developed facts. Indeed, a bankruptcy judge
> cannot accept the proponent's word that the settlement is
> reasonable, nor may the judge merely rubber stamp a
> proposal. . . . Rather, a bankruptcy judge must determine
> that a proposed compromise . . . is fair and equitable.
> In determining whether a settlement is fair and
> equitable, the bankruptcy court should consider: (1)
> probability of success in the litigation; (2)
> difficulties, if any, with collection, (3) the complexity
> of the litigation, including the expense, inconvenience
> and delay attendant to the litigation; and (4) the
> interest of creditors. The experience and knowledge of
> the bankruptcy court judge is of significance in
> assessing the propriety of the settlement.   In
> determining the reasonableness of a settlement, a
> bankruptcy judge must decide only whether the settlement
> falls between the lowest and highest points in the range
> of reasonableness.

Hearing Tr. at 214-16 (internal quotation marks omitted) (citing

*In re Andre Chreky, Inc.*, 448 B.R. 596, 609 (D.D.C. 2011);

*Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 554 (D.D.C.

2008); *Protective Comm. for Indep. Stockholders of TMT Trailer*

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re W.D.*

*Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

At the hearing, the court stated:

> So I think that not approving the settlement would add to
> the expense and the delay attendant to the litigation,
> and it would be inconvenient to proceed to actual

litigation instead of proceeding to a settlement that I
think is well-grounded and [a result of] sound business
judgment.

The trustee testified at length and discussed his
inquiries of Mr. Yelverton regarding the contentions in
the litigation, the defenses that were being raised, and
showed, I thought, an extensive knowledge of what the
issues were. And showed a substantial diligence on his
part in digging into the various pleadings that were
filed, various motions that were filed.  He reviewed the
case law that was submitted by Mr. Yelverton to him
incident to reviewing the litigation.  Also the statutory
provisions that Mr. Yelverton provided.   And I'm
convince[d] that the trustee did give very careful
thought to the likely outcome of a litigation and its
expense and reasonably relied upon the advice of his
counsel that other than the ownership interest in
Yelverton Farms, these other claims were not nearly as
valuable in terms of trying to negotiate a settlement.

The motion is approved. The settlement is in the interest
of creditors.  And when I include creditors, I include
the debtor as a residuary entity entitled to whatever
could be obtained if enough were received to pay
creditors in full and something left over for the debtor.
I think he recognizes that that never would happen and
that the reason that he's objecting to the settlement is
because he wants to minimize how much he has left over to
pay nondischargeable debts.   This settlement falls
readily between the lowest and highest points in the
range of reasonableness.  I am convinced the trustee has
used sound business judgment in trying to arrive at this
settlement and avoid the expenses of litigation and bring
this matter to a close so that creditors can receive some
distribution.  The motion is approved.

Hearing Tr. at 218, 227-28, 230-31.  On June 19, 2012, the clerk

entered the bankruptcy court's order approving the settlement

agreement (Dkt. No. 477).

Yelverton pursued appeals of that order and of orders

rejecting Yelverton's plethora of efforts seeking, directly or

indirectly, to undo the order approving the settlement.

Specifically, Yelverton took appeals to the district court from the following:

- *Order Granting Motion to Approve Settlement Agreement* (Dkt. No. 477);

- *Order Denying Amended Motion to Compel Trustee to Abandon Litigation Claims* (Dkt. No. 505);

- *Order Denying Motion to Vacate Order Approving Settlement* (Dkt. No. 507);

- *Memorandum Decision and Order Denying Motion to Alter or Amend Decision* (Dkt. No. 597) (rejecting Yelverton's attempt to claim that the litigation claims were exempted from the estate under 11 U.S.C. § 522);

- *Order Denying Second Motion to Vacate Order Approving Settlement* (Dkt. No. 682);

- *Order Denying Motion to Vacate Order Denying Motion for Relief from Judgment* (Dkt. No. 696); and

- *Order Denying Motion to Vacate Memorandum Decision* (Dkt. No. 704).

On August 6, 2014, the district court issued a decision and orders in the appeals, Civil Action Nos. 12-01539 and 13-00454, affirming all of those orders.[5]

II

In his corrected amended complaint, Yelverton alleges that Webster engaged in certain breaches of his fiduciary duties. Yelverton's complaint, however, is merely a recitation of labels and conclusions without any factual support. Yelverton specifically lists his claims against Webster in subparagraphs (a)

---

[5]   The decision is reported as *Yelverton v. Webster (In re Yelverton)*, 2014 WL 3849634 (Aug. 6, 2014).

8

through (m) of paragraph 107 of the corrected amended complaint.
As to each of those claims, Yelverton has failed to state a claim
upon which relief can be granted under the pleading standards of
*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct.
1955, 1974, 167 L. Ed. 2d 929 (2007) (a complaint must plead
"enough facts to state a claim to relief that is plausible on its
face"); and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed.
2d 868 (2009) (a complaint fails "if it tenders naked assertions
devoid of further factual enhancements").[6]   Yelverton argues in

---

[6]  As Webster notes:

In deciding a motion to dismiss, although the court "must
construe the allegations and facts in the complaint in
the light most favorable to the plaintiff . . . ,"
*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 195 (D.D.C.
2002), the complaint must nevertheless plead "enough
facts to state a claim to relief that is plausible on its
face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570,
127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007), and "the
court need not accept inferences drawn by plaintiffs if
such inferences are unsupported by the facts set out in
the complaint . . . nor must it accept legal conclusions
cast in the form of factual allegations." *Kowal v. MCI
Commc'ns Corp.*, 16 F.3d 1271, 1276, 305 U.S. App. D.C. 60
(D.C. Cir. 1994); see also *In re IAC/InterActiveCorp Sec.
Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) (the
court will not credit conclusory statements unsupported
by factual allegations or legal conclusions presented as
factual allegations); *Ashcroft v. Iqbal*, 129 S. Ct. 1937,
1949, 173 L. Ed. 2d 868 (2009) (a complaint fails "if it
tenders naked assertions devoid of further factual
enhancements").   In deciding a motion to dismiss, "the
Court may only consider the facts alleged in the
complaint, documents attached as exhibits or incorporated
by reference in the complaint, and matters about which
the Court may take judicial notice." *Gustave-Schmidt*, 226
F. Supp. 2d at 196.

9

his response that the complaint's allegations are "facts" and re-states many of his allegations.  However, calling legal points and conclusory allegations "facts" does not make them so.  *See, e.g.*, *Ey v. Chief Admin. Off. of U.S. House of Reps.*, 967 F. Supp. 2d 337, 347 (D.D.C. 2013) ("The Court does not have to accept conclusory allegations as true facts merely because they are plead [*sic*] as such.").

### A.

First, Yelverton alleges:

> Webster breached his Fiduciary Duty to Creditors of "full and candid disclosure" by not informing them that he is a long-time "close personal friend" of Tarkenton, who serves as counsel in the Bankruptcy for Marm, a statutory per se "insider" to the Debtor, and where her interests are conclusively adverse to the Creditors.

Corr. Am. Compl. ¶ 107(a).  Even if Webster and Tarkenton are close personal friends, it was Tarkenton's clients, not Tarkenton himself, who were the targets of the claims settled by the settlement agreement.  It is not unusual for members of the bar who practice bankruptcy law to be close friends.  As a matter of law, there is no rule that bars an individual from acting as a bankruptcy trustee, administering claims of the estate, simply because the targets of the claims are represented by the individual's close personal friend.  Such a rule would be unwarranted.  Without more (and nothing more is alleged here) a friendship with Tarkenton, even a close personal friendship, cannot constitute a basis upon which Webster breached his duty to

10

faithfully administer the chapter 7 estate. Nor was there a duty on the part of Webster, when his friendship with Tarkenton did not create a conflict of interest, to notify creditors that he is a close personal friend of Tarkenton.

Of course, a trustee has a conflict of interest when the trustee is charged with conducting an "investigation into . . . potential wrongdoing" involving the trustee's "important clients, close business associates or personal friends" as in *In re Granite Partners L.P.*, 219 B.R. 22, 42 (Bankr. S.D.N.Y. 1998), or *Shaw & Levine v. Gulf & Western Industries, Inc. (In re Bohack Corp.)*, 607 F.2d 258, 264 (2d Cir. 1979) ("An attorney who has been closely related by professional, business and personal ties to those whose conduct may now be suspect is evidently in no position to make any objective appraisal of the nature and extent of their involvement.").

The same would apply to the trustee's handling a monetary claim against a close personal friend even when the claim is not based on potential wrongdoing or suspicious conduct. Here, however, Tarkenton's role as an attorney for Yelverton's sisters did not turn Webster's evaluation of the claims and the proposed settlement into a consideration of any claims against Tarkenton: there were no such claims.

Even in the criminal law context of the Sixth Amendment, courts recognize that when a party's attorney has a close

personal friendship with a person involved in the case, but who
is not a party in the case, this does not, without more,
constitute a conflict of interest, giving rise to a claim of
ineffective assistance of counsel. *See Lombardo v. United
States*, 222 F. Supp.2d 1367, 1386 (S.D. Fla. 2002):

> [N]othing in either the Supreme Court's or Eleventh
> Circuit's jurisprudence regarding this issue suggests
> that a personal relationship, however intimate—as opposed
> to an attorney-client relationship, concurrent or
> successive—can give rise to a conflict of interest for a
> Sixth-Amendment, ineffective-assistance-of-counsel claim.
> This rule of law is not only made clear by Supreme
> Court's and Eleventh Circuit's decisions, but it is also
> sound public policy. **Given the close-knit nature of many
> legal communities -- in small- and moderately-sized
> towns, as well as some larger ones -- precluding defense
> counsel from representing defendants when counsel have a
> personal, as opposed to an attorney-client, relationship
> with a co-defendant, a witness or a potential witness
> would not advance the purpose of the Sixth Amendment's
> right to counsel, which is to ensure that defendants
> receive fair trials.**

(Emphasis added.) *See also Riley v. South Carolina*, 82 F. Supp.
2d 474, 479 (D.S.C. 2000):

> The statement of Riley's counsel indicated that Riley's
> counsel and the investigating officer had been involved
> with the same cases before. This statement would not
> lead a reasonable mind to believe that Riley's counsel
> was actively working with the investigating officer on
> the instant case or that Riley's counsel was representing
> the interests of the state.

For all these reasons, Webster was not disqualified from
acting as trustee, based on his close personal friendship with
Tarkenton. Because the relationship did not create a conflict of
interest, Webster had no duty to disclose the relationship to

12

creditors.

In any event, Yelverton, as the residuary beneficiary of the estate, and as a debtor who has nondischargeable debts owed to some creditors (and who thus desires their distributions from the estate to be maximized), cannot complain in that regard because he was fully aware of the relationship before Webster negotiated the settlement.  If Yelverton believed that the relationship constituted a conflict of interest, he could have raised the issue in objecting to the motion to approve the settlement and when he participated at length in the evidentiary hearing on that motion.  He did not raise the issue.  A right may be forfeited by the failure to make timely assertion of that right in the court having jurisdiction to determine it, and Yelverton ought not be allowed to sandbag the court by remaining mum at the hearing on approval of the settlement about any objection based on Webster's close friendship with Tarkenton and then raising the objection only once the court ruled against him.  *See, e.g.*, *Stern v. Marshall*, 131 S.Ct. 2594, 2608, 180 L.Ed.2d 475 (2011).  Accordingly, Yelverton has forfeited raising the issue and lacks standing to raise the issue now.

B.

Next, Yelverton alleges:

> Webster breached his Fiduciary Duty to Creditors of "full and candid disclosure" by not informing them that his "close personal friend," Tarkenton, had an irreconcilable conflict of interest in violation of the D.C. Rules of

13

> Professional Conduct, Rule 1.7 (a), which would cause
> irreparable "taint" to the Bankruptcy, by Tarkenton
> representing both a statutory per se "insider" to the
> Debtor, who is Marm, and a Creditor with actual adverse
> interests to her, which is JPMorgan.

Corr. Am. Compl. ¶ 107(b). The corrected amended complaint fails

to include any facts to support the allegation that Tarkenton had

an irreconcilable conflict of interest. Even if Tarkenton had a

conflict of interest (that is, in representing Marm and JPMorgan

he was representing interests that were adverse to each other),

the corrected amended complaint fails to allege any facts

demonstrating that Webster was under a duty to inform creditors

that Tarkenton had such a conflict of interest.

Moreover, the corrected amended complaint fails to

articulate any way in which the estate has been damaged by reason

of any such conflict of interest: Marm or JPMorgan might have

grounds for complaining against Tarkenton if Tarkenton had a

conflict of interest in representing the two of them, but that

does not show a wrong as against the estate.

C.

Yelverton next alleges:

> Webster breached his Fiduciary Duty to Creditors of "full
> and candid disclosure" and of "loyalty," by falsely
> suggesting to them that the Debtor Estate was "no asset,"
> which would financially benefit Marm, a statutory per se
> "insider" to the Debtor, and the client of his "close
> personal friend," Tarkenton.

Corr. Am. Compl. ¶ 107(c). The corrected amended complaint

offers no explanation for how the estate's being a "no asset"

14

case would financially benefit Marm.  In any event, Yelverton

fails to include any facts to support his allegation that Webster

falsely suggested to creditors that Yelverton's estate was a "no

asset" case.  Indeed, Webster took the position early on that

payment of a dividend appeared possible.  In issuing notice of

the conversion of the bankruptcy case to chapter 7, the clerk

gave notice to creditors under Fed. R. Bankr. P. 2002(e) not to

file claims.  Under Fed. R. Bankr. P. 3002(c)(5):

> If notice of insufficient assets to pay a dividend was
> given to creditors under Rule 2002(e), and subsequently
> the trustee notifies the court that payment of a dividend
> appears possible, the clerk shall give at least 90 days'
> notice by mail to creditors of that fact and of the date
> by which proofs of claim must be filed.

Webster was appointed interim trustee on September 9, 2010, and

conducted a meeting of creditors on September 23, 2014, at which

he examined Yelverton.  The following day, September 24, 2014,

the clerk issued notice to creditors that payment of a dividend

may be possible and set a deadline for filing proofs of claim.

                              D.

Yelverton next alleges:

> Webster breached his Fiduciary Duty to Creditors of "full
> and candid disclosure" by not informing them he had
> received information from Yelverton that his stock and
> equity interests and litigation claims included in the
> Debtor Estate had a value of up to $3 Million, and his
> "pig finishing" operation had a value of up to $1
> Million.

15

Corr. Am. Compl. ¶ 107(d).[7]  The following examination of the
record in the bankruptcy case reveals, however, that Webster
engaged in "full and candid disclosure" regarding these estate
assets, adequately informing creditors about Yelverton's "stock
and equity interests and litigation claims" included in the
estate, including his "'pig finishing' operation."

Webster negotiated a settlement resolving all of the claims
asserted in that litigation and disposing of Yelverton's stock in
Yelverton Farms, Ltd.  Under the terms of the settlement the
estate will receive a cash payment of $110,000.  A motion to
approve the settlement pursuant to Rule 9019 of the Federal Rules
of Bankruptcy Procedure was filed by Webster in this case on May
4, 2012.  A detailed explanation of the rationale in support of
the settlement was included in the motion.  This included this
discussion of the value of the debtor's stock in Yelverton Farms,
Ltd.:

> The Trustee has determined that the Debtor has grossly
> overestimated the fair market value of his interest in
> the business.  Granted, the business may hold certain
> value for the members of the Debtor's family.  However,
> the tax returns do not support a valuation in the range
> of the $300,000 estimated by the Debtor.  It is
> undisputed that the sole source of income for Yelverton
> Farms is the revenue from the production contract with
> Maxwell Foods.  However, the production contract has no
> specified term and may be terminated upon thirty days'

_____

[7]  Yelverton identifies the assets worth $3,000,000 as
Yelverton's stock in Yelverton Farms, Ltd., and Yelverton's
litigation claims in the Eastern District of North Carolina
litigation.  Corr. Am. Compl. ¶ 102.

notice.  In addition, Yelverton Farms' status as a tenant under the lease for the hog farm operation significantly diminishes the value of the business to an independent investor.   Given  the  limited  term  of  the  production contract and lease, there is no legally projected stream of income which may be relied upon for the purpose of evaluating the value of the business.

The motion also included this explanation of why the litigation claims were of little value:

Apart  from  the  issue  of  the  fair  market  value  of  the Debtor's ownership interest in the business, the cost to continue the litigation of these claims is a compelling factor  justifying  a  cost-effective  resolution  of  this matter.   The  Defendants  have  asserted  extensive  and detailed  factual  disputes  and  complex  legal  defenses based  on  North  Carolina  State  law  in  response  to  the Debtor's claims.   See Defendants' Motion to Dismiss and Answer to Amended Complaint Fed. R. Civ. P. 12(b)(1) and 12(b)(6);  Response  to  Plaintiff's  Motion  for  Summary Judgment for "Meiselman" Claims per NCGS 55-14-30 (2)(ii) and  Memorandum  in  Opposition  to  Motion  for  Summary Judgment  for  Meiselman  Claims  per  N.C.  Gen.  Stat. §§ 55-14-30(2)(ii), attached hereto as Exhibits 6, 7 & 8. The  Trustee's  North  Carolina  counsel  has  cautioned  the Trustee that the attorney time and expense required to participate  in  a  full  scale  trial  of  these  issues  would be  substantial  and  would  severely  offset  any  recovery realized on behalf of the bankruptcy estate.   Currently, the  estate  has  no  funds  available  to  advance  toward  the cost  of  such  litigation.   Additionally,  in  view  of  the defenses and legal arguments asserted by the Defendants in response to the Debtor's claims, there is significant risk that the Trustee may not prevail in a trial on the merits of the claims.

Notice of Webster's settlement was provided to all creditors and interested parties in the case.  All creditors and interested parties were also notified of the hearing regarding Webster's settlement.  At the June 18, 2012, hearing, Webster thoroughly explained his evaluation of the value of Yelverton's assets.

Webster was cross examined by Yelverton, as well as other creditors, regarding all stated objections to the settlement. The court found that Webster had "used his sound business judgment" in reaching the settlement and that the settlement was reasonable and in the best interests of the Debtor and his creditors.  Hearing Tr. at p. 231; June 19, 2012, Order.

In short, Webster provided creditors with more than adequate information regarding the settlement.

E.

Yelverton next alleges:

> Webster breached his Fiduciary Duty to Creditors of "full and candid disclosure" and of "loyalty," by not informing them before the Section 341 Meeting on September 23, 2010, or before the Discharge on December 3, 2010, that he would be negotiating with his "close personal friend," Tarkenton, a Settlement of Case No. 5:09-cv-331, with claims against Marm of up to $3 Million, which claims and property were Yelverton's only remaining Assets in the Debtor Estate to pay Creditors, and where Marm is a statutory per se "insider" to the Debtor, whose interests are conclusively adverse to the Creditors.

Corr. Am. Compl. ¶ 107(e).  This blend of allegations already discussed above fails to establish any breach of fiduciary duty. First, as discussed in part D., above, Webster made full and candid disclosure of the facts pertinent to creditors' consideration of the proposed settlement.

Second, as discussed in part A., above, there was no duty on the part of Webster to disclose that Tarkenton, the attorney with whom he was negotiating the settlement, is a close personal

friend.  In any event, Yelverton was aware of that friendship prior to the settlement and is barred from raising the issue now.

Finally, that Marm is an insider adds nothing to the claim. In negotiating the settlement of claims of the estate and against the estate, Webster's duties were the same whether any party on the other side (like Marm) was an insider or not.

F.

Yelverton next alleges:

> Webster breached his Fiduciary Duty to the Creditors of "full and candid disclosure" and of "loyalty," by not informing them that Marm, a statutory per se "insider" to the Debtor, and the client of his "close personal friend," Tarkenton, would financially benefit from the Discharge on December 3, 2010, which would be to the financial detriment of the Creditors.

Corr. Am. Compl. ¶ 107(f).  Yelverton specifically alleges that:

> Webster failed to disclose to the Creditors that the Discharge of up to $2 Million in claims against the Debtor would substantially reduce the amount that Marm needed to pay Webster in a Settlement to cover these Creditor claims because they would be extinguished, and thus would financially benefit Marm.

Corr. Am. Compl. ¶ 101.[8]  This is nonsense.  A debtor's discharge operates as an injunction against collection of dischargeable debts as a personal liability of the debtor, 11 U.S.C. § 524(a)(2), but does not eliminate those claims as claims against the estate, and, accordingly, has no impact on a

---

[8]   Similarly, he alleges that "Marm financially benefitted by a Discharge of the Creditors, where the amounts Discharged would <u>not</u> need to be paid by her in the Settlement."  Corr. Am. Compl. ¶ 103.

trustee's administration of the assets of the estate.

G.

Yelverton next alleges:

Webster breached his Fiduciary Duty to Creditors and the
Debtor Estate of "loyalty," by not taking action,
pursuant to 11 U.S.C. 704(a)(6), to delay the Discharge
on December 3, 2010, in order to have more  time to
ascertain the value of the Assets in the Debtor Estate,
where Yelverton had informed him the value was up to $3
Million, but where his "close personal friend,"
Tarkenton, told him the Assets in the Debtor Estate have
no value, and where Tarkenton's client, Marm, would
substantially financially benefit to the detriment of
Creditors by the Assets having nominal or no value.

Corr. Am. Compl. ¶ 107(g).  These allegations make no sense.

Under 11 U.S.C. § 704(a)(6), a trustee shall "if appropriate,

oppose the discharge of the debtor."  None of the grounds in 11

U.S.C. § 727(a) for objecting to the debtor's receiving a

discharge are stated.  Moreover, the debtor's discharge has no

impact on the administration of the assets of the estate, and

specifically, as pertinent here, has no impact on the timing of

the trustee's investigation of the assets of the estate, and

whether the settlement ought to have been approved.

H.

Yelverton next alleges:

Webster breached his Fiduciary Duty to Creditors of "full
and candid disclosure" and of "loyalty," by not informing
them during the one year period after the Discharge on
December 3, 2010, under 11 U.S.C. 727 (e)(l), that his
"close personal friend," Tarkenton, was claiming the
Assets of the Debtor Estate have no value, in order for
his client, Marm, to acquire these Assets at nominal or
no cost, to the detriment of the Creditors, but where

20

Tarkenton had no evidence to support his claim of no value.

Corr. Am. Compl. ¶ 107(h). Once again, this focus on the discharge makes no sense. The discharge has no impact on a trustee's administering the assets of the estate.[9] The one-year period under § 727(e)(1) is no more a critical time to provide to creditors information regarding the assets to be administered, when warranted, than any other period of time in the case.

The allegations regarding Webster's failure to provide information to creditors during that one-year period fare no better than similar allegations of failure to provide information to creditors during other stages of the case. As explained in part A., above, Webster had no duty to inform creditors that Tarkenton is his close personal friend. As to the failure to inform creditors regarding Tarkenton's low-balling the value of the estate's assets, it is obvious that Tarkenton's role as an attorney on behalf of his clients would be to attempt to convince Webster of any facts demonstrating that the assets had little or

---

[9] Under 11 U.S.C. § 727(e)(1), a request for a revocation of a discharge may be made under 11 U.S.C. § 727(d)(1) within one year after the discharge is granted. Under § 727(d)(1), the discharge may be revoked for various specified acts of misconduct by the debtor. Yelverton fails to allege any facts establishing that there was a basis for seeking revocation of the debtor's discharge. Yelverton alleges that creditors could request that the discharge be revoked "based upon any fraud by 'insiders' to the Debtor in hiding the value of Assets in the Debtor Estate." Cor. Am. Compl. ¶ 99. Fraud by an insider is *not* a basis for revoking the discharge, and no such fraud is pled in any event.

no value.  There was no need to disclose the obvious to
creditors.  In any event, as discussed in part D., above, Webster
disclosed the existence of various defenses asserted by
Tarkenton's clients against the estate's litigation claims, and
their contentions regarding the existence of little or no value
in Yelverton's shareholder interest in Yelverton Farms, Ltd.

Finally, as Webster disclosed in his motion to approve the
settlement and as he testified at the hearing on that motion, he
evaluated the value of the Debtor's assets with the assistance of
North Carolina counsel.  It is obvious he did not adopt
Tarkenton's view without investigation.

### I.

> Webster breached his Fiduciary Duty to Creditors and the
> Debtor Estate of "loyalty" and of being "disinterested"
> in the administration of the Estate, by always favoring
> the interests of his "close personal friend," Tarkenton,
> and his client, Marm, a statutory per se "insider" to the
> Debtor, whose interests are conclusively adverse to the
> Creditors.

Corr. Am. Compl. ¶ 107(i).  This conclusory allegation that
Webster always favored the interests of his close personal
friend, Tarkenton, and Tarkenton's client, Marm, is not supported
by any allegations of fact showing that Webster engaged in such
favoring of Tarkenton and Marm.

### J.

> Yelverton next alleges:

> Webster breached his Fiduciary Duty to Creditors and the
> Debtor Estate of "loyalty" and of being "disinterested"

22

> in the administration of the Estate by negotiating a Settlement with his "close personal friend," Tarkenton, where Webster would be paid all the proceeds of $110,000, to cover his legal fees, but where Creditors would not be paid.

Corr. Am. Compl. ¶ 107(j). This allegation does not contain well-pled facts establishing a breach of fiduciary duty. In considering a proposed settlement, the focus is on whether the amount to be paid the estate is a reasonable settlement, not on what claims will be paid from the settlement proceeds. If a settlement is a reasonable one, it is not inappropriate for the trustee to enter into that settlement even if the settlement will generate proceeds sufficient to pay only administrative claims.

Of course, a trustee's "duty is to maximize the value of the estate, not of a particular group of claimants." *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987). Here, however, there are no well-pled facts demonstrating that Webster was attempting only to realize sufficient funds to pay administrative claims in negotiating the settlement. Moreover, the settlement was approved as in the best interest of the estate, not as in the best interest of any particular group of claimants, and, as noted earlier, the court took into account not only the interest of creditors but the interests of Yelverton as the residuary beneficiary of the estate and as a debtor who would remain saddled with nondischargeable debts not fully paid from the settlement. Hearing Tr. at 230-31.

23

In any event, the legal fees of the attorneys representing Webster have not yet been allowed, and it is not clear that, when the settlement agreement was entered into, it was predictable that those fees would exhaust the $110,000. If the commission to be paid Webster as trustee combined with any award to Webster's attorneys of their allowable administrative claims for fees exceed the $110,000 settlement proceeds, Yelverton will likely bear the blame for that. After the settlement was approved, Yelverton has made a huge number of frivolous filings, here and in the district court, that have subjected Webster to requiring numerous hours of attorney assistance.

A trustee is entitled to settle risky litigation for an appropriate sum and not instead engage in that risky litigation (litigation that he has reasonably concluded will likely fetch the estate little or nothing). In those circumstances, a trustee is not required to accede to a debtor's expressed desire that the trustee pursue the risky litigation in the off chance that the trustee will hit pay dirt, making a recovery that will leave a large amount to be distributed to creditors (some of which hold nondischargeable claims the debtor wishes to see paid from the estate and eliminated as debts for which he is responsible after he receives a discharge).

K.

Yelverton next alleges:

> Webster breached his Fiduciary Duty to Yelverton's
> Spouse, as a Creditor, by denying to her any property of
> the Debtor Estate to pay Non-Discharged Debts to her.

Corr. Am. Compl. ¶ 107(k).  This allegation includes no well-pled

facts establishing that Webster breached his fiduciary duty.  The

Debtor's spouse, a creditor, has filed a proof of claim to which

Webster has not objected.  As the holder of an allowed claim, she

will receive whatever distribution to which she is entitled under

the Bankruptcy Code.

L.

Yelverton next alleges:

> Webster breached his Fiduciary Duty to the Debtor of
> being "disinterested" in the administration of the
> Estate, by always siding with his "close personal
> friend," Tarkenton, and always taking sides against the
> Debtor, where Webster's actions against the Debtor would
> leave him "insolvent" and prevent his "fresh start" from
> Bankruptcy.

Corr. Am. Compl. ¶ 107(l).  This allegation is similar to the

allegation addressed in part J., above, and fails to state a

claim upon which relief can be granted for the same reasons.  As

there noted, a trustee is entitled to settle risky litigation for

an appropriate sum and not instead engage in that risky

litigation (litigation that he has reasonably concluded will

likely fetch the estate little or nothing).  In those

circumstances, a trustee is not required to accede to a debtor's

expressed desire that the trustee pursue the litigation in the

off chance that the trustee will hit pay dirt, making a recovery

that will leave him solvent (by generating a distribution fully

paying nondischargeable claims, and thus rendering the debtor

debt free and solvent upon receiving a discharge).

M.

Finally, Yelverton alleges:

Webster breached his Fiduciary Duty to the Debtor of
being "disinterested" in the administration of the
Estate, by continually attacking before the Bankruptcy
Court and the District Court the Debtor's credibility,
truthfulness, integrity, and trustworthiness, with
nothing in support other than the fact of the Debtor
objecting to Webster's "collusive" Settlement Agreement
with his "close personal friend," Tarkenton, and where
Webster's attacks against the Debtor would prevent his
"fresh start" from Bankruptcy.

Corr. Am. Compl. ¶ 107(m).  This allegation is not supported by

any well-pled facts establishing that Webster breached his

fiduciary duty.  Any attacks by the trustee on Yelverton are a

matter of record in the papers he has filed in the bankruptcy

court and the district court, and all of them were well

justified.

III

In addition to failing the standard set by Rule 12(b)(6),

Yelverton's amended complaint is barred by the doctrines of *res

judicata* and collateral estoppel  Those doctrines serve both the

individual, by barring the annoyance of repetitive litigation,

and the public as a whole, by promoting the finality and

26

reliability of judicial decisions and by minimizing judicial

waste.[10]  As the U.S. Supreme Court summarized:

> Issue preclusion refers to the effect of a judgment in
> foreclosing relitigation of a matter that has been
> litigated and decided.  This effect also is referred to
> as direct or collateral estoppel.  Claim preclusion
> refers to the effect of a judgment in foreclosing
> litigation of a matter that never has been litigated,
> because of a determination that it should have been
> advanced in an earlier suit.  Claim preclusion therefore
> encompasses the law of merger and bar.

*Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77,

104 S.Ct. 892, 79 L.Ed.2d 56 (1984), *cited in Durkin v. Shields*,

No. 92-1003-IEG, 1997 WL 808651, at *8-9 (S.D. Cal. June 5,

1997).  The *Durkin* court elaborated:

> Thus, under the doctrine of issue preclusion, an issue
> "actually litigated and necessarily determined by a
> court" may not be relitigated in a suit on a different
> cause of action involving a party to the previous
> litigation.  Claim preclusion, by contrast, bars a party
> and its privies from raising any ground for recovery that
> was or could have been asserted in a prior action between
> the same parties on the same cause of action.

1997 WL 808651, at *9.

### A.

The allegations of the corrected amended complaint boil down

to the claim that Webster breached his fiduciary duties by

agreeing to a settlement that was unreasonable.  Yelverton's

corrected amended complaint is barred by claim preclusion.

Claim preclusion applies "if there has been prior litigation

---

[10]  *See* Robert von Moschzisker, *Res Judicata*, 38 Yale L.J.
299 (Jan. 1929).

(1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Natural Res. Def. Council v. E.P.A.*, 513 F.3d 237, 260 (D.C. Cir. 2008).  Whether two proceedings are based on the same claim "turns on whether they share the same nucleus of facts." *Id.* at 261; *see also Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984).  Claim preclusion is "intended to prevent litigation of matters that should have been raised in an earlier suit," as well as matters that were actually raised. *Natural Res. Def. Council* , 513 F.3d at 261.

Yelverton has not contested that he and Webster were in privity with regard to the settlement agreement.  Indeed, he is in privity with the trustee even though Yelverton was not a signatory to the settlement agreement because the trustee succeeded to the debtor's interest in the bankruptcy estate when he was appointed as the trustee and he "[stood] in the shoes of the debtor" in negotiating the settlement.  *See In re Collins*, 489 B.R. 917 (Bankr. S.D. Ga. 2012); *In re Salander*, 450 B.R. 37, 47 (Bankr. S.D.N.Y. 2011).  The court's order approving the settlement is a "final order entitled to "full res judicata effect." *See In re Gibraltar Res., Inc.*, 210 F.3d 573, 576 (5th Cir. 2000), *quoted in In re Salander*, 450 B.R. at 47. *See also Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112

F.3d 1232 (1st Cir. 1997) ("The finality of court-approved

settlements . . . is important, especially to the efficient

administration of the estate and to reassure settling parties

that the trustee will not relitigate the settled claims."),

*quoted in In re Salander*, 450 B.R. at 47; *In re Walker*, 356 B.R.

877, 891 (Bankr. S.D. Fla. 2006).[11]  This court had competent

jurisdiction to enter the order approving the settlement.

Yelverton's claim involves the same claim as Webster's

motion to approve the settlement because it arises from the same

nucleus of facts.  Webster's motion to approve the settlement

amounted to a claim for an adjudication that the settlement was

reasonable.  Yelverton's claim that Webster breached his

fiduciary duties in entering into the settlement is based on the

same nucleus of facts.  Indeed, "[a] motion to approve a

settlement under Rule 9019 of the Federal Rules of Bankruptcy

Procedure "offers [the trustee] the invaluable opportunity to

procure the court's assurance that his decision to settle will

not be second-guessed at some later date by a disgruntled

creditor objecting to his fees or making a claim against his

---

[11]  Yelverton argues in his response that the settlement
agreement is not final because the settlement sum has not yet
been paid to the trustee; he also argues that various other
proceedings are not final.  However, his focus is misplaced: it
is the court's order approving the settlement which is imbued
with the finality necessary for claim preclusion, regardless of
whether the settlement sum has been paid or whether the
bankruptcy case is still pending.

bond." *In re Novak*, 383 B.R. 660, 670 (Bankr. W.D. Mich. 2008).

Moreover, "[t]he court may give substantial deference to the

business judgment of the bankruptcy Trustee when deciding whether

to approve a settlement." *In re Salander*, 450 B.R. at 48

(quoting *In re Receivership Estate of Indian Motorcycle Mfg.*, 299

B.R. 8, 21 (D. Mass. 2003)).

In addition, Yelverton raised or had the opportunity to

raise those assertions in opposing the motion for approval of the

settlement agreement.  Webster gave Yelverton and creditors full

and fair notice of his motion, and Yelverton had a full and fair

opportunity to oppose the motion in writing and at the hearing,

both by examining Webster and making opening and closing

arguments.  Yelverton admits that he knew the facts on which he

bases his current motion (namely, that Webster was a "close

personal friend" of Tarkenton) prior to his filing his opposition

to Webster's motion to approve settlement and prior to the

hearing on Webster's motion.  He thus could have raised Webster's

friendship with Tarkenton prior to the court's approval of the

settlement and in fact did raise the issue of Webster's fiduciary

duties at the hearing.  Claim preclusion bars Yelverton's claim

that the settlement was not reasonable and a breach of Webster's

fiduciary duties.

B.

Even under the more restrictive doctrine of issue

30

preclusion, Yelverton's attack on the settlement is barred.  For
issue preclusion to apply, "[1] the same issue now raised must
have been contested by the parties and submitted for judicial
determination in the prior case[; 2] the issue must have been
actually and necessarily determined by a court of competent
jurisdiction in that prior case[; and 3] preclusion in the second
case must not work a basic unfairness to the party bound by the
first determination." *Martin v. Dep't of Justice*, 488 F.3d 446,
454 (D.C. Cir. 2007), quoting *Yamaha Corp. of Amer. v. United
States*, 961 F.2d 245, 254 (D.C. Cir. 1992).  Each of these
elements applies here.

First, Yelverton contested the reasonableness of the
settlement in objecting to the motion to approve the settlement.
In addition, he specifically contested whether the trustee had
faithfully discharged his fiduciary duties and conducted cross
examination on the subject.  Second, the issue was actually and
necessarily determined by the bankruptcy court having
jurisdiction to decide the motion.  To approve the settlement,
the bankruptcy court was required to and did determine that the
settlement agreement was a reasonable one.  *In re Yelverton*, --
B.R. --, 2014 WL 3849634, *4 (D.D.C. Aug. 6, 2014).  The court
also specifically found that the trustee had exercised sound
business judgment in negotiating and agreeing to the settlement,
necessarily rejecting any argument that Webster breached his

31

fiduciary duties in negotiating and agreeing to the settlement.
Finally, preclusion in this adversary proceeding would not work a
basic unfairness to Yelverton. A basic unfairness exists if "the
party to be bound lacked an incentive to litigate [the issue] in
the first [cause of action], especially in comparison to the
stakes of the second [cause of action]." *Otherson v. Dep't of
Justice, Immigration & Naturalization Serv.*, 711 F.2d 267, 273
(D.C. Cir. 1983) (citing *Blonder-Tongue Labs., Inc. v. Univ. of
Ill. Found.*, 402 U.S. 313, 333, 91 S.Ct. 1434, 28 L.Ed.2d 788
(1971)). Yelverton plainly had an incentive to litigate fully
against the motion to approve the settlement, as is evidenced by
his vigorous performance at the hearing and his repeated attempts
to undo the approval of that settlement.

Nevertheless, the plaintiff "must be permitted to
demonstrate, if he can, that he did not have a fair opportunity
procedurally, substantively, and evidentially to pursue his claim
the first time." *Blonder-Tongue*, 402 U.S. at 333 (internal
quotation marks omitted). Yelverton was permitted that
opportunity and has failed to show otherwise. As the Court
explained in *Blonder-Tongue*, "a party who has had one fair and
full opportunity to prove a claim and has failed in that effort,
should not be permitted to go to trial on the merits of that
claim a second time. Both orderliness and reasonable time saving
in judicial administration require that this be so unless some

32

overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case." *Id.* at 324-25. Yelverton cannot now mount a new challenge to the reasonableness of the settlement collaterally by asserting that Webster breached his fiduciary duties in negotiating the settlement.

IV

Because Webster is entitled to dismissal of the corrected amended complaint pursuant to his motion to dismiss based on the defense the surety shares that there was no breach of fiduciary duty, the corrected amended complaint falls as to the surety as well. *See United States v. State Farm Fire & Cas. Co. (In re Joplin)*, 882 F.2d 1507, 1511 (10th Cir. 1989) (bankruptcy court granted a trustee's motion to intervene in proceeding against the trustee's surety, granted the trustee's motion for summary judgment, and dismissed the proceeding as to both the trustee and the surety). Although the surety has not responded to the corrected amended complaint yet (Yelverton's only having mailed it on September 9, 2014, according to a proof of service filed at Dkt. No. 73), it makes sense to dismiss the adversary proceeding in its entirety as to both defendants. This adversary proceeding is yet another example of Yelverton's subjecting the trustee to litigation of meritless claims that has only resulted in increasing the costs of administration of the estate. It is time

33

to bring the bankruptcy case closer to a final resolution, and
the complaint plainly fails to pass muster under Fed. R. Civ. P.
12(b)(6).  Accordingly, it makes sense to dismiss the corrected
amended complaint and this adversary proceeding in their
entirety, and not to delay entry of a final judgment pending the
surety's response to the corrected amended complaint.

V

I turn now to the issue of whether I may treat this
proceeding as a core proceeding that statutorily I am authorized
to decide under 28 U.S.C. § 157(b)(1) or whether, instead,
Article III of the Constitution only permits me to issue a
proposed ruling for consideration by the district court.
Statutorily, the proceeding is a core proceeding because core
proceedings include "matters concerning the administration of the
estate."  11 U.S.C. § 157(b)(2)(A).  *Schultze v. Chandler (In re
Colusa Mushroom, Inc.)*, --- F.3d at ----, 2014 WL 3537030 (9th
Cir. July 18, 2014); *Walsh v. Northwestern Nat'l Ins. Co. (In re
Ferrante)*, 51 F.3d 1473, 1476 (9th Cir. 1995) (post-petition
breach of fiduciary claim against a trustee was a core
proceeding); *Maitland v. Mitchell (In re Harris Pine Mills)*, 44
F.3d 1431, 1435 (9th Cir.1995) (a postpetition state-law claim
against a bankruptcy trustee arising out of the sale of estate
property was a core proceeding); *Capitol Hill Group v. Pillsbury,
Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 489 (D.C. Cir. 2009)

34

("In sum, we agree with our sister circuits that malpractice
claims against court-appointed professionals stemming from
services provided in the bankruptcy proceeding are inseparable
from the bankruptcy context and constitute a proceeding 'arising
in' the bankruptcy.").

Constitutionally too the proceeding, at this juncture,
should be treated as a core proceeding.  Courts have concluded
that a bankruptcy court possesses statutory and constitutional
authority when a particular claim necessarily would have been
resolved in a bankruptcy proceeding, *see In re Frazin*, 732 F.3d
313, 319-20 (5th Cir. 2013), and, here, the propriety of
Webster's conduct was determined when the court approved the
settlement.  In addition, courts have determined that a
bankruptcy court may decide malpractice claims against estate
professionals, *see Albert v. Site Management, Inc.*, 506 B.R. 453,
459 (D. Md. 2014), and the reasoning of such decisions applies
equally to actions against a trustee and his surety for the
trustee's having breached his fiduciary duty.

Moreover, under 11 U.S.C. § 105, a bankruptcy court has
broad power to implement the provisions of the Bankruptcy Code
and to prevent an abuse of the bankruptcy process.  *See Walton v.
LaBarge (In re Clark)*, 223 F.3d 859, 864 (8th Cir. 2000); *In re
Volpert*, 110 F.3d 494, 500 (7th Cir. 1997); *Jones v. Bank of
Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1089

(10th Cir. 1994).  Yelverton has engaged in a series of frivolous
litigation in this and the district court, and this is yet
another instance.  An order dismissing this adversary proceeding
does not offend Article III of the Constitution because it
amounts in effect to an order, as authorized by 11 U.S.C. § 105,
barring the pursuit of Yelverton's meritless and vexatious
claims, subject to review of the order by way of appeal.

Congress intended that bankruptcy courts, to the maximum
extent constitutionally permissible, be allowed to hear and
decide proceedings, subject to review by way of appeal.  Allowing
a Rule 12(b)(6) dismissal of this type of frivolous and vexatious
proceeding against a trustee to be treated as a core proceeding
advances that Congressional goal.  I will treat this proceeding,
in its present posture of requiring a determination of whether
Rule 12(b)(6) bars the proceeding, as both statutorily and
constitutionally a core proceeding.

However, the issue is largely academic because review on
appeal by the district court of the Rule 12(b)(6) dismissal
order, a review of a question of law, will be *de novo* just as
would be review under 28 U.S.C. § 157(c)(1) of proposed findings
of fact and conclusions of law recommending dismissal under Rule
12(b)(6).  *De novo* review by way of appeal will accord Yelverton
all of the Article III review to which he is entitled.  *See*
*Schultze*, 2014 WL 3537030 at *2, n.1.

36

When treating a statutory core proceeding as a core proceeding is constitutionally invalid, a bankruptcy court may nevertheless treat the proceeding as non-core and issue proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1). *Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, --- U.S. ----, 134 S. Ct. 2165, 2174, 189 L.Ed.2d 83 (2014). If Article III of the Constitution barred my adjudicating the Rule 12(b)(6) motion, this ruling shall constitute my proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1). If the district court agrees that Rule 12(b)(6) requires dismissal of the proceeding, the district court need not decide the Article III question because it can enter a judgment decreeing that (1) the judgment of dismissal is affirmed if the bankruptcy court had authority to dismiss the proceeding, and, in the alternative, (2) the proceeding is dismissed if the bankruptcy court was not

authorized to decide the proceeding.[12]

### VI

Finally, Yelverton has filed a motion to certify this as a class action on behalf of all creditors.  That motion must be denied.  Because the corrected amended complaint fails to state a claim upon which relief can be granted, there is no point in making such a certification.  Moreover, even if the complaint stated a claim upon which relief could be granted, Yelverton has forfeited some of his claims, and thus cannot act as a class representative on behalf of creditors who did not forfeit such claims.  Finally, he is not an attorney who is a member of the bar of the district court of which this court is a unit under 28 U.S.C. § 151 and thus he is not authorized to represent any such creditors in this adversary proceeding.

### VII

A judgment follows granting the trustee's motion to dismiss;

---

[12]  For example, the district court's judgment in *First American Title Ins. Co. v. Stevens (In re Stevenson)*, Case No. 1:13-cv-00440-RJL (D.D.C. Mar. 21, 2014) (Dkt. No. 7), directed that it is:

> ORDERED that the bankruptcy court's Judgment . . . is affirmed (and, in the alternative, if the claims that judgment adjudicated were required to be decided by this court de novo, the bankruptcy court's rulings and its judgment regarding those claims are adopted as the rulings and judgment of this court regarding those claims effective as of the date of this judgment).

denying Yelverton's motion for class certification; dismissing this adversary proceeding in its entirety; and directing that if the bankruptcy court was not authorized to decide the motion to dismiss, this decision constitutes the bankruptcy court's proposed findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1).

[Signed and dated above.]

Copies to: All counsel of record.